**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**NADINE CHATMAN,**

    **Plaintiff,**

        **v.**

**SONNY PERDUE, SECRETARY,**
**DEPARTMENT OF AGRICULTURE,**

    **Defendant.**

**Civil Action No. 17-1826 (JEB)**

<u>**MEMORANDUM OPINION**</u>

*Pro se* Plaintiff Nadine M. Chatman, a Black woman over the age of 40, held a temporary-employment position at the United States Department of Agriculture from 2011 to 2015. Unhappy with the environment there and the agency's refusal to extend her stint, she brought this suit alleging a hodgepodge of discriminatory and retaliatory actions by her various supervisors in violation of Title VII and the Age Discrimination in Employment Act. She further contends that she was subjected to a hostile workplace at USDA, and that she is entitled to relief on several common-law tort claims.

Defendant Sonny Perdue, Secretary of Agriculture, now moves for summary judgment, contending that no reasonable jury could find that Plaintiff suffered discrimination or retaliation or experienced a hostile environment, and that the Court lacks jurisdiction to consider her remaining claims. Agreeing that her accumulation of perceived slights is both legally insufficient and factually unsupported, the Court will grant Defendant's Motion.

1

I.      **Background**

A.  Factual Background

In assessing motions for summary judgment, courts must set out the facts in the light most favorable to the non-moving party.  Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011). A principal mechanism is the comparison of the parties' statements of disputed or undisputed material facts.  See Fed. R. Civ. P. 56(c); LCvR 7(h)(1).  While Chatman here challenges many of the Government's facts, her "Statement Regarding Disputed Issues" is entirely devoid of the record citations that Federal Rule 56(c)(1) requires.  See ECF No. 38 (Pl. Opp.) at 2–3. Similarly, her more general statement of facts contains few citations and digresses to various topics bearing little relevance to her legal claims.  Id. at 3–11.  Although the Court will not "accept facts that do not cite support from the record or conclusions masquerading as facts," Johnson v. Wash. Metro. Area Transit Auth., 314 F. Supp. 3d 215, 216 (D.D.C. 2018), it nevertheless endeavors here to set out the facts in the light most favorable to Plaintiff.  A brief overview will suffice, as more details about the specific incidents underlying her claims — to the extent the Court can discern them — appear in the Analysis.  See infra Section III.

Chatman began working at USDA in October 2011 as a temporary employee with a set term of up to four years.  See ECF No. 35 (Def. SMF), ¶¶ 2, 5–6; ECF No. 39 (Def. Reply), Exh. 2 (Documents) at ECF p. 8 (5/8/14 EEO Investigative Report).  After starting as a Program Specialist in the agency's Equal Employment Opportunity Conflict Office, she was reassigned in October 2012 to the Corporate Services Division (CSD) in the Office of the Assistant Secretary for Civil Rights (OASCR), where she remained until the expiration of her appointment in September 2015.  See Def. SMF, ¶¶ 1–2, 10.  In that role, Plaintiff informed aggrieved individuals of their rights and obligations under equal-employment laws, performed complaint

intake, and attempted to effect informal resolutions between the individuals and the agency.  See
ECF No. 35 (MSJ), Exh. 16 (Documents) at ECF pp. 71–73 (Chatman EEO Affidavit); U.S.
Equal Emp't Opportunity Comm'n, Equal Employment Opportunity Pre-Complaint Processing
(Feb. 20, 2020), https://bit.ly/3lnsCl4.

According to Chatman, her work environment became increasingly hostile beginning in
February 2013, when her first-level supervisor, Barbara Moore, implied that she was mentally
disabled and made a handful of other comments that Plaintiff found intimidating and harassing.
See Pl. Opp., Exh. 12 (5/7/13 EEO Complaint) at ECF p. 32; MSJ, Exh. J (11/6/19 Chatman
Depo.) at 36–37, 41, 43–44.  That same month, her fourth-level supervisor, Joe Leonard, accused
a group of employees including Plaintiff of stealing and hiding EEO complaint files.  See Def.
Reply, Exh. 2 at ECF pp. 2–3 (Jackson EEO Affidavit); 5/8/14 EEO Investigative Report at ECF
pp. 20, 22; Def. SMF, ¶ 12.  She also points to an undefined "relationship" between Leonard and
Candace Glover — who supervised Plaintiff in her final year of employment, see Def. SMF,
¶ 11; Def. Reply, Exh. 1 (Documents) at ECF p. 23 (Glover EEO Affidavit) — as well as a
"sexually charged" culture within OASCR that further contributed to a hostile working
environment.  See Pl. Opp. at 20, 34–35; Chatman EEO Affidavit at ECF p. 54.

Aggrieved by these and other incidents, Chatman states that she filed her first EEO
complaint in April 2013 (though Defendant suggests her initial filing did not actually come until
May).  Compare Pl. Opp. at 23; 11/6/19 Chatman Depo. at 82, with MSJ at 3; 5/8/14 EEO
Investigative Report at ECF p. 39.  As the perceived transgressions accumulated over the ensuing
two years, Plaintiff was not shy about registering her unhappiness, filing a host of additional
EEO complaints alleging discrimination, retaliation, and harassment, along with an August 2014
complaint with the Office of Special Counsel regarding poor management and insufficient

oversight within OASCR.  <u>See</u> MSJ at 2–5 (citing seven EEO complaints); Chatman EEO

Affidavit at ECF p. 100; <u>id.</u> at pp. 144–49 (final OSC report).

Chatman's situation, however, did not improve.  She contends that management began

attempting to reassign her in mid-2013, pointing in particular to one proposed transfer to another

division within USDA, though no reassignment ultimately occurred.  <u>See</u> Def. Reply, Exh. 1 at

ECF p. 154 (3/15/16 Chatman Depo.); 5/8/14 EEO Investigative Report at ECF pp. 195, 200; Pl.

Opp. at 22–24.  She also indicates that her 2014 performance-evaluation rating was suddenly

adjusted from "Outstanding" to the lower level of "Superior."  MSJ, Exh. L (2014 Performance

Appraisal) at ECF pp. 2–3; <u>id.</u>, Exh. 14 (2014/2015 Report of Investigation) at 116–17.  Further,

she objects to the process surrounding her 2015 application — and ultimate non-selection — for

a permanent position as an equal-employment specialist within OASCR.  <u>See</u> Glover EEO

Affidavit at ECF p. 44; Pl. Opp. at 30–31.

Chatman's employment at USDA concluded on September 29, 2015, pursuant to the

terms of her initial appointment.  <u>See</u> Def. SMF, ¶ 17.

B.  <u>Procedural Background</u>

As a result of the aforementioned episodes — as well as a series of others, which the

Court will describe in due course — Plaintiff brought suit in this Court on September 7, 2017,

filing an Amended Complaint on July 2, 2018.  <u>See</u> ECF No. 1 (Compl.); ECF No. 15 (Am.

Compl.).  Although somewhat difficult to decipher, as it touches on an abundance of incidents

with varying degrees of relevance, her pleading chiefly asserts discrimination based on race, sex,

and age; retaliation for her protected activity; and a hostile work environment.  <u>See</u> Am. Compl.

at 30–40.  Discovery complete, the agency now moves for summary judgment, as well as to

dismiss several of Plaintiff's claims for lack of jurisdiction.

## II.    Legal Standards

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant, in other words, is required to provide

evidence that would permit a reasonable jury to find in her favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

Separately, and in addition, Defendant moves to dismiss several of Plaintiff's claims under Rule 12(b)(1).  In considering such a motion, a court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  It is the plaintiff, however, who bears the burden of proving that the court has subject-matter jurisdiction to hear her claims.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  The court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

## III.    Analysis

Plaintiff's Amended Complaint asserts several common-law torts, along with causes of action under Title VII and the Age Discrimination in Employment Act.  See Am. Compl. at 30–40; Pl. Opp. at 1–2.  It is not immediately apparent from this lengthy pleading and her convoluted Opposition to Defendant's Motion, however, which particular incidents give rise to which of her various claims.  Indeed, at times, the Court is left guessing as to what Chatman maintains even occurred.  It will nevertheless do its best to plod through each category of claims. It begins with Plaintiff's common-law counts, then turns to her more fundamental allegations of discrimination and retaliation, and concludes with her contention that she was subjected to a hostile workplace.

A.  <u>Common-Law Claims</u>

The Court can make short work of Plaintiff's common-law allegations.  No merits

analysis is required, as each is barred by sovereign immunity, appeared only in summary-

judgment briefing, or both.

The Court begins with Chatman's claim that her various supervisors defamed her in

several contexts over the course of her four-year stint at USDA.  For instance, she points to

comments from Leonard in a February 2013 meeting relating to an alleged theft of EEO files, a

remark by Moore a month later calling her "obviously limited," and sworn statements by

Leonard and another agency employee before the OSC in September 2014.  <u>See</u> Pl. Opp. at 11–

12, 15–17; Am. Compl. at 37–38; <u>see also</u> Rodney A. Smolla, 1 <u>Law of Defamation</u> § 1:11 (2d

ed. 2020) (explaining that "libel is defamation by written or printed words, . . . while slander

consists of communication of a defamatory statement by spoken words").

The Federal Tort Claims Act provides "[t]he exclusive remedy for torts committed by

Government employees in the scope of their employment."  <u>Wilson v. U.S. Dep't of Transp.</u>, 759

F. Supp. 2d 55, 64 (D.D.C. 2011).  The Court, accordingly, construes Plaintiff's defamation

claim as arising under the FTCA, which works as a limited waiver of the federal government's

sovereign immunity.  <u>See</u> <u>Sloan v. U.S. Dep't of Housing & Urban Dev.</u>, 236 F.3d 756, 759

(D.C. Cir. 2001).  Although the Act waives the Government's immunity with respect to some

torts, it expressly exempts from such waiver certain intentional torts, including libel and slander.

<u>Jackson v. United States</u>, 857 F. Supp. 2d 158, 161 (D.D.C. 2012) (citing 28 U.S.C. § 2680(h));

<u>see also</u> <u>Millbrook v. United States</u>, 569 U.S. 50, 52 (2013) (discussing FTCA intentional-tort

exception).  "In other words, both the United States and federal employees acting within the

scope of their duties are immune from common law actions for libel and slander."  <u>Simpkins v.</u>

Dist. of Columbia Gov't, 108 F.3d 366, 371 (D.C. Cir. 1997).  Plaintiff's "defamation claim

against the United States," therefore, "is barred."  Gardner v. United States, 213 F.3d 735, 737

n.1 (D.C. Cir. 2000); see also, e.g., James v. United States, 48 F. Supp. 3d 58, 64 (D.D.C. 2014)

(dismissing defamation claim against United States as barred by sovereign immunity).

Relatedly, USDA seems to believe that Plaintiff asserts a distinct claim of "fraud" based

on unspecified conduct.  See MSJ at 2, 8.  That understanding comes as a surprise to the Court,

as the Amended Complaint did not plead, and her Opposition nowhere mentions, any count

based on fraud.  Even had she articulated such a claim, however, it would go nowhere, as the

FTCA similarly "exempts fraud and misrepresentation from [its] general waiver of sovereign

immunity."  Maxberry v. Dep't of the Army, 952 F. Supp. 2d 48, 52 (D.D.C. 2013) (citing 28

U.S.C. § 2680(h)); see also Bell v. United States, 301 F. Supp. 3d 159, 164–65 (D.D.C. 2018)

(same).

Finally, Plaintiff's Opposition appears to assert an invasion-of-privacy claim based on

allegations that another USDA employee improperly accessed and viewed her EEO complaints

nearly two-dozen times.  See Pl. Opp. at 1–2, 37–38.  Although Chatman briefly mentions the

alleged conduct giving rise to this theory in her Amended Complaint, see Am. Compl. at 21, 24,

that document does not plead an independent count of invasion of privacy.  It is well established

that a plaintiff cannot broaden her complaint in a summary-judgment opposition brief, much less

amend it to advance a new count entirely.  Taylor v. Mills, 892 F. Supp. 2d 124, 137–38 (D.D.C.

2012); Jo v. District of Columbia, 582 F. Supp. 2d 51, 64 (D.D.C. 2008).  In any event, even if

the Court could consider this claim, Plaintiff nowhere contends that she exhausted it at the

administrative level, as required for any claim brought pursuant to the FTCA.  See 28 U.S.C.

§ 2675(a) (requiring plaintiff to have "presented the claim" to appropriate federal agency);

Simpkins, 108 F.3d at 371 (explaining that "FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies") (quoting McNeil v. United States, 508 U.S. 106, 113 (1993)); see also Stoddard v. U.S. Parole Comm'n, 900 F. Supp. 2d 38, 41–42 (D.D.C. 2012) (citing GAF Corp. v. United States, 818 F.2d 901, 919 (D.C. Cir. 1987)) (explaining that plaintiff "bears the burden of proving exhaustion," which is jurisdictional prerequisite to bringing FTCA suit); Peavey v. United States, 846 F. Supp. 2d 10, 17 (D.D.C. 2012) (dismissing FTCA claim where plaintiff neither pled nor argued that he had exhausted administrative remedies).

The Court, therefore, will dismiss Chatman's common-law claims.

### B.  Discrete Discrimination and Retaliation Claims

#### 1.  *Legal Framework*

As the gravamen of her suit, Chatman alleges specific incidents of discrimination and retaliation under both Title VII and the ADEA.  See Am. Compl. at 1.  As relevant here, the former prohibits personnel actions based on race and sex, see 42 U.S.C. § 2000e–16(a), and the latter protects individuals 40 and older from age discrimination.  See 29 U.S.C. § 633a(a).  Both statutes forbid retaliation against employees who engage in protected activity, such as filing an EEO complaint.  See Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008).

In weighing a discrete discrimination or retaliation claim under either of these laws, the Court must follow the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).  See Stoe v. Barr, 960 F.3d 627, 639 (D.C. Cir. 2020) (applying framework to Title VII claims); Ford v. Mabus, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying framework to ADEA claims).  Under that familiar framework, the plaintiff must first establish a *prima facie* case of discrimination or retaliation.  McDonnell Douglas, 411 U.S.

at 802 (discrimination claim); <u>Durant v. Dist. of Columbia Gov't</u>, 875 F.3d 685, 696–97 (D.C. Cir. 2017) (retaliation claim).  To clear that hurdle, she need only show that "(1) she is a member of a protected class" or, in the retaliation context, that she "engaged in statutorily protected activity"; "(2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination" or, in the case of retaliation, "that a causal link connects the [protected activity and the adverse action]." <u>Czekalski</u>, 475 F.3d at 364 (internal quotation marks and citation omitted); <u>Jones v. Bernanke</u>, 557 F.3d 670, 677 (D.C. Cir. 2009).

For discrimination claims, a defendant may rebut a plaintiff's *prima facie* showing with evidence of a "legitimate, nondiscriminatory reason" for its action.  <u>Stoe</u>, 960 F.3d at 639 (quoting <u>Holcomb</u>, 433 F.3d at 896).  If the employer succeeds, the burden then shifts back to the plaintiff, who must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000) (quoting <u>Tex. Dep't of Cmty Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).  When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — <u>and should not</u> — decide whether the plaintiff actually made out a prima facie case under <u>McDonnell Douglas</u>." <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008). The Court's sole task in such cases is to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" <u>Id.</u>; <u>see</u> <u>Evans v. Sebelius</u>, 716 F.3d 617, 620 (D.C. Cir. 2013) (explaining that courts evaluate this question "in light of the total circumstances of the case," including "the plaintiff's *prima facie*

case") (quoting Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012)).  To defeat summary judgment, moreover, the plaintiff must "present[] enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence."  Desmond v. Mukasey, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks and citation omitted).

Similarly, for retaliation claims, "the defendant's rebuttal may take the form of a 'non-retaliatory explanation' for its action."  Moss v. Hayden, No. 18-470, 2020 WL 4001467, at *3 (D.D.C. July 15, 2020) (quoting Jones, 557 F.3d at 678).  As in the discrimination context, if the plaintiff has suffered an adverse employment action and the defendant has asserted a legitimate, non-retaliatory reason for its decision, the Court simply considers whether the plaintiff "has produced sufficient evidence for a reasonable jury to find that [the defendant's] asserted reasons for each action were mere pretexts for illegal retaliation."  Alford v. Def. Intel. Agency, 908 F. Supp. 2d 164, 172 (D.D.C. 2012) (citing Brady, 520 F.3d at 494); see also id. (explaining that Brady's "streamlined framework applies to retaliation claims").

### 2. *Application*

The Court first turns to a question that ordinarily should not be difficult — namely, which decisions and actions does Plaintiff allege were the result of unlawful discrimination or retaliation?  Unfortunately, Chatman has not made things easy.  The "disparate treatment" count in her Amended Complaint sounds simple enough, stating that she was "harassed" by several supervisors, had her "telework privileges" temporarily revoked, and that two other employees "were given the opportunity to extend their employment" after their temporary appointments concluded.  See Am. Compl. at 4, 30, 32 (capitalization altered).  Similarly, Plaintiff's "retaliation" count alleges only a single instance of a supervisor's accusing her of stealing

complaint files.  Id. at 33 (capitalization altered).  Other sections of the Amended Complaint, however, appear to assert numerous additional instances of discrimination — though not explicitly based on race, sex, or age — and retaliation.  Chatman's Opposition expands on some of these claims, ignores others, and introduces several new incidents entirely.

While the Court will not address incidents that appear nowhere in the Amended Complaint, out of an abundance of caution and mindful that "[c]ourts must construe *pro se* filings liberally," Richardson v. United States, 193 F.3d 545, 548 (D.C. Cir. 1999), it will err on the side of overinclusivity and endeavor to cover each of the instances of disparate treatment and retaliation that the Amended Complaint seemingly attempts to raise (and that Plaintiff has not now abandoned).  It begins with the claim that Chatman's non-selection for an open Equal Employment Specialist position in 2015 constituted both discrimination and retaliation, before addressing a series of other allegations of discrimination and retaliation based on her protected characteristics and activity.

### a.   2015 Non-Selection

Chatman alleges that she was discriminated against based on age, and retaliated against for her protected activity, "when she was not selected for a position of Equal Employment Specialist in 2015."  Am. Compl. at 40.  Her Opposition adds that this non-selection was also based on sex discrimination.  See Pl. Opp. at 30–31.  Whether the Court considers this latter basis is immaterial, as Plaintiff cannot establish that Defendant's legitimate, non-discriminatory, non-retaliatory explanation for her non-selection was pretextual.

As previously mentioned, Chatman held a temporary appointment scheduled to conclude on September 29, 2015.  See Def. SMF, ¶¶ 6–8.  With that date approaching, she applied for an open, permanent position as an Equal-Employment Specialist within OASCR and was

interviewed on September 2, 2015.  See Pl. Opp. at 30; id., Exh. 21 (EEO Specialist Position

Summary) at ECF p. 1.  Along with nearly 200 other applicants, however, she ultimately was not

selected.  See Glover EEO Affidavit at ECF pp. 41, 44.  Plaintiff cried foul, protesting that

decision in an EEO complaint and now here.  See MSJ at 5 n.4

      Although the parties do not directly address this question, the Court begins by concluding

that the adverse-action requirement is satisfied, given that selection would have entitled Chatman

to permanent employment, a marked elevation from her soon-to-expire temporary position.  See

Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009) ("An 'adverse employment action' is 'a

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing significant change in

benefits.'") (quoting Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003)); Benjamin v.

Duncan, 694 F. Supp. 2d 1, 6 (D.D.C. 2010) (determining that plaintiff's non-selection for

position was adverse employment action); Gaskins v. McIntyre, No. 18-997, 2019 WL 451349,

at *1 (D.D.C. Feb. 5, 2019) (finding that failure to hire for permanent position following

expiration of temporary employment was adverse employment action).

      Turning to the next step, the Court concludes that the Government has articulated a

"legitimate, nondiscriminatory," "non-retaliatory" reason for Plaintiff's non-selection — namely,

that she was ineligible for the merit-promotion list from which candidates were ultimately

selected.  Holcomb, 433 F.3d at 896; Jones, 557 F.3d at 678.  At the outset of the hiring process,

the agency sorted applicants into three groups: candidates applying under competitive merit-

promotion procedures (77 individuals), candidates applying under non-competitive hiring

procedures (40 individuals), and external candidates (82 individuals).  See Glover EEO Affidavit

at ECF pp. 41, 44–45; EEO Specialist Position Summary at ECF pp. 1–2 (listing non-

competitive and merit-promotion candidates as of September 16, 2015). Plaintiff's name appeared on the "non-competitive" list because she "did not qualify" for merit promotion, see Glover EEO Affidavit at ECF pp. 44–45, 47–48 — presumably because of her temporary appointment. See U.S. Dep't of Agriculture, Departmental Regulation: Merit Promotion and Internal Placement (July 22, 2015), https://bit.ly/33ie7IW (explaining that, in general, "only career or career-conditional status . . . employees may be considered for positions which are to be filled under merit promotion authority"). After a three-member panel interviewed 79 candidates — including Plaintiff herself — from the merit-promotion and non-competitive lists, it elected to conduct second-round interviews only for individuals on the merit-promotion list. See Glover EEO Affidavit at ECF pp. 42, 44. As the selecting official explained, because there were "many qualified applicants" in that group, it was unnecessary to consider individuals — such as Plaintiff — who did not have merit-promotion status. Id. at ECF pp. 41–42, 45; see also id. at ECF p. 42 (explaining that non-competitive applicants "were not considered further" because "there were a significant number of qualified status applicants"). The two individuals ultimately selected for the positions were drawn from the merit-promotion list. Id. at ECF pp. 46–49.

With that explanation established, the Court turns to the "one central question" remaining: has Plaintiff "produced sufficient evidence for a reasonable jury to find that [her] employer's asserted non-discriminatory reason" for her non-selection "was not the actual reason and that the employer intentionally discriminated against [her]" based on her protected characteristics? Brady, 520 F.3d at 494; see also Alford, 908 F. Supp. 2d at 172–73 (same for retaliation). As an initial matter, the Court notes that Chatman never addresses USDA's non-discriminatory, non-retaliatory explanation for her non-selection in any fashion. Nowhere does

14

she contend that the agency could not limit its focus to the merit-promotion list, or that she should have been included on it.  Indeed, she never even mentions such list, despite Defendant's having highlighted the subject in its brief.  See MSJ at 17–18.  Plaintiff, instead, appears to mount several distinct rebuttals.  None gets off the ground.

First, she takes issue with the composition of the three-member interview panel, arguing that one member, Crystal Gist, was "not eligible to participate in the interview process" because she was then a temporary employee.  See Pl. Opp. at 7, 30; Glover EEO Affidavit at ECF p. 42 (describing three-member interview panel).  Even assuming that this is correct, in no way does Gist's participation suggest that the agency's decision to select from the merit-promotion list "was not the actual reason for" the non-selection, much less that the "actual reason" was based on discrimination or retaliation.  Gilbert v. Napolitano, 670 F.3d 258, 261 (D.C. Cir. 2012) (quoting Brady, 520 F.3d at 496 n.4); see also Johnson, 314 F. Supp. 3d at 220 (holding that employer's violation of internal policy was insufficient "to support the conclusion that its explanation for the challenged employment action is pretextual") (quoting Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996)).  Similarly, Plaintiff's contention that the interview process was "tainted" and "illegal" because Gist helped interview the two individuals ultimately selected for the openings, see Pl. Opp. at 31, and her unsupported claim that the process was "rigged" for "preselected" candidates, id., in no way suggest discrimination or retaliation against Chatman.

Plaintiff next posits, without any explanation, that OASCR managers "discriminated against [her] when they allowed . . . Gist to appear on the Selection Panel."  Id. at 32–33.  But this conclusory, citation-less assertion of discrimination (untethered to any protected characteristics) does not suffice to survive a summary-judgment motion.  See Anderson, 477

U.S. at 252 (explaining that non-moving party must come forward with more than "a scintilla of evidence in support of [her] position").  Nowhere does Chatman present <u>any</u> evidence that Gist's presence on the panel affected her in any negative fashion, or that the act of placing Gist there somehow constituted discrimination against Plaintiff.  Gist, it might be added, is a Black woman over 40, just like Plaintiff.  <u>See</u> Pl. Opp. at 1, 7.

Although Plaintiff does not expressly contend that the selection panel itself discriminated against her, it bears noting that one candidate ultimately selected was a Black woman, and the other was a Black man over 40.  <u>Id.</u> at 43.  The fact that each of the selected individuals exhibited one of the two characteristics on which Plaintiff asserts discrimination — female and over 40 — "cuts strongly against any inference of discrimination."  <u>Jenkins v. District of Columbia</u>, 281 F. Supp. 3d 77, 85 (D.D.C. 2017) (quoting <u>Murray v. Gilmore</u>, 406 F.3d 708, 715 (D.C. Cir. 2005)) (explaining that fact that contested position was filled by members of same race as plaintiff casts doubt upon allegation that non-selection was discriminatory).  In addition, Chatman never attempts to demonstrate that she was "<u>significantly</u> better qualified for the job" than either selectee.  <u>Holcomb</u>, 433 F.3d at 897.

Finally, all Plaintiff has to say about retaliation is her single-sentence assertion that she "was not selected because of her previous EEO activity."  Pl. Opp. at 31.  Much like her discrimination claim, this "naked, conclusory allegation[] of retaliatory motive" cannot establish "that Defendant's asserted reasons were in fact pretexts for unlawful retaliation."  <u>Alford</u>, 908 F. Supp. 2d at 174.  She presents no evidence that the agency's decision to select from among the qualified merit-promotion candidates — as opposed to from the non-competitive list on which she appeared — had anything to do with her at all, much less her prior protected activity.

16

In sum, because Chatman does not generate an inference that her non-selection involved discrimination based on her protected characteristics or retaliation for her protected activity, she cannot establish a material issue of triable fact.

> b.   Other Discrimination Claims

The remaining instances of alleged discrimination each require considerably less discussion, as Plaintiff declines now to assert any with much vigor.

> i.   Non-Extension of Temporary Employment

The Court begins with Chatman's temporary appointment, which commenced on October 3, 2011, for a term not to extend beyond September 29, 2015.  See Def. SMF, ¶¶ 5–8; MSJ, Exh. B (10/3/11 Offer Letter) at ECF p. 2; 5 C.F.R. § 213.3102(r) (stating that appointments such as Plaintiff's "may not exceed 4 years").  A generous reading of her Amended Complaint suggests that it alleges discrimination based on USDA's refusal to extend her employment after such temporary appointment concluded.  See Am. Compl. at 23, 32.  Yet Plaintiff does not now appear to press this claim, as her Opposition forbears from advancing any contention of discrimination surrounding the natural lapse of her employment term and its non-extension.

Even taking the Amended Complaint on its own terms, the claim goes nowhere, as Chatman never alleges that she sought any such extension (let alone presents evidence to that effect).  Although the Amended Complaint and Opposition gesture at the employment history of Leila Levi — a former temporary employee who ultimately did obtain a permanent position at USDA, id. at 23; Pl. Opp. at 9 — Plaintiff has done nothing to show that she and Levi are "similarly situated," as required to establish that she was not rehired for discriminatory reasons. See Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 301 (D.C. Cir. 2015) (requiring plaintiff to "demonstrate that 'all of the relevant aspects of [her] employment situation were nearly

identical to those of the [similarly situated] employee'") (quoting Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999)).  Unlike Chatman, Levi was a lawyer who independently applied for and obtained a permanent role in the agency's Office of General Counsel.  See MSJ, Exh. 16 at ECF p. 20 (6/11/16 EEO Investigative Report).  Nor do her references to Candace Glover, whom Plaintiff briefly alleges received "preferential treatment" from USDA higher-ups, gain traction. See Pl. Opp. at 34.  Chatman nowhere suggests that any differential treatment was based on protected characteristics, never contends that the alleged conduct deprived her of any particular opportunity at USDA, and declines to demonstrate that she and Glover were similarly situated.

For these reasons, Plaintiff cannot now cobble together a discrimination claim on the basis of any non-extension, nor can she repackage her failed non-selection claim in such form.

### ii.    Telework Revocation

Although the Amended Complaint appears to allege discrimination based on age, sex, and race because she had her "telework privileges taken away" for a brief period in early 2013, see Am. Compl. at 4, 32, her Opposition devotes only a single sentence to the issue in the context of her hostile-work-environment claim.  See Pl. Opp. at 20.  Because Chatman no longer appears to contend that this episode constituted a discrete act of discrimination, and provides no detail surrounding the alleged teleworking revocation or evidence of disparate treatment, any such claim cannot withstand Defendant's Motion.  See Grimes v. District of Columbia, 794 F.3d 83, 94 (D.C. Cir. 2015) (explaining that plaintiff opposing summary judgment must "identify evidence that a reasonable jury could credit in support of each essential element of her claims").

### iii.    Perceived Mental Disability

Finally, and somewhat puzzlingly, the Amended Complaint and Opposition appear to assert an ill-defined claim of "perceived mental disability."  Am. Compl. at 20 (capitalization

altered); Pl. Opp. at 1, 27; see also MSJ at 13 (stating that Plaintiff's protected classes include, "if applicable, physical/mental disability").  Plaintiff, however, invokes only Title VII and the ADEA, neither of which protects against discrimination based on real or perceived disabilities. As best the Court can tell, by "perceived mental disability," Chatman refers to a supervisor's February 2013 comment to a co-worker that Plaintiff was "obviously limited."  5/8/14 EEO Investigative Report at ECF p. 70; see Am. Compl. at 20; Pl. Opp. at 27.  As Plaintiff appears to lump this comment in with her hostile-work-environment allegations, see Pl. Opp. at 17, and never contends that it amounts to discrimination based on her race, sex, or age, the Court will address it later in that context.

### c.   Other Retaliation Claims

Next up are the various instances in which Plaintiff maintains she experienced retaliation for her protected activity.  As with her discrimination claims, none survives Defendant's Motion.

### i.   2014 Performance Evaluation

First, Chatman focuses on her 2014 performance evaluation, which her supervisor changed from an initial rating of "Outstanding" to merely "Superior."  2014 Performance Appraisal at ECF pp. 2–3; Pl. Opp. at 38–39.  She contends that this revision constituted retaliation for her prior protected activity.  See Pl. Opp. at 38; Am. Compl. at 21–22 (referencing OSC complaint filed in August 2014).

As in the discrimination context, a "threshold question" for Plaintiff's retaliation claim is whether she has established the requisite "adverse action."  Dreiband v. Nielsen, 319 F. Supp. 3d 314, 321 (D.D.C. 2018); see Baloch, 550 F.3d at 1196–99 (rejecting discrimination and retaliation claims for failure to demonstrate adverse action).  "'Adverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim."

19

Baloch, 550 F.3d at 1198 n.4.  For a claim of retaliation, "an action is adverse if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Crowley v. Vilsack, 236 F. Supp. 3d 326, 330 (D.D.C. 2017) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

Chatman cannot clear this initial hurdle.  In the D.C. Circuit, a "thick body of precedent . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions."  Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir. 1999).  Rather, "performance reviews typically constitute adverse actions only when attached to financial harms."  Baloch, 550 F.3d at 1199; see also Taylor, 892 F. Supp. 2d at 142 (explaining that "a performance evaluation must normally affect tangible job opportunities or benefits" in order to rise to adverse action); Burns v. Wash. Metro. Area Transit Auth., 918 F. Supp. 2d 35, 41 (D.D.C. 2013) (similar).  Here, however, Plaintiff has presented no evidence that she suffered any kind of "tangible financial harm" from the 2014 evaluation.  Taylor, 892 F. Supp. 2d at 142. Indeed, her "Superior" evaluation can hardly be deemed negative.  Because there were "no objectively discernible consequences resulting from the performance appraisal, the appraisal itself cannot constitute a materially adverse employment action as a matter of law."  Alford, 908 F. Supp. 2d at 171.

Even assuming Chatman could clear the adverse-action bar, she has done nothing to rebut Defendant's legitimate, non-retaliatory reason for the rating change.  As her immediate supervisor explained, following Plaintiff's initial evaluation in November 2014, upper-level management determined that reviewers were distributing too many "Outstanding" ratings.  See 2014/2015 Report of Investigation at 116.  As a result, "all managers needed to go back and reevaluate their ratings," and some of the formerly "Outstanding" marks — including Plaintiff's

— were lowered to "Superior." Id. at 116–17.  Chatman has presented no evidence that she was

inappropriately singled out, or that there existed any connection between her protected activity

several months earlier and the "Superior" rating — which, after all, is the same rating she

received the year prior.  See MSJ, Exh. I (Documents) at ECF pp. 2–3 (2013 Performance

Appraisal); see also Iyoha v. Architect of Capitol, 927 F.3d 561, 574 (D.C. Cir. 2019)

(explaining that, at summary judgment, "[m]ere temporal proximity is not sufficient" to discredit

defendant's proffered non-retaliatory explanation for challenged action).

The Court also notes that Plaintiff repeatedly claims that her 2015 performance

evaluation — which once again judged her "Superior," see MSJ, Exh. I at ECF p. 10 (2015

Performance Appraisal) — was fraudulent, concluding from the fact that she neither sat for nor

signed such evaluation that the document was "fabricated."  See Pl. Opp. at 1, 3, 9, 38–39, 42.

She never bothers to explain, however, how this alleged fabrication relates to any of her claims,

or how it constitutes discrimination or retaliation.

### ii.    Leonard's "Amnesty" Comments

Similarly unavailing is Plaintiff's contention that Leonard retaliated against her in a staff

meeting on February 22, 2013, when he addressed a group of CSD employees regarding a

collection of missing EEO complaint files.  Id. at 17.  According to Chatman, Leonard accused

meeting attendees of hiding the files and offered amnesty to the staff if they were returned.  See

5/8/14 EEO Investigative Report at ECF p. 20; Pl. Opp. at 17.  Plaintiff believes that these

comments were directed at her and were driven by her "previous EEO activity."  See Pl. Opp. at

17.  The Amended Complaint's retaliation count cursorily alludes to similar comments by

another supervisor, Barbara Moore, see Am. Compl. at 33, but her Opposition does not discuss

them in the context of either discrimination or retaliation.

As an initial matter, it is not clear what protected activity forms the basis for this retaliation claim.  The identified episode predates her first EEO complaint by several months, and although she served as a witness supporting two of her colleagues' own complaints, she never clarifies when that occurred.  See Pl. Opp. at 23.  In any event, once more, Plaintiff has not established an adverse action.  While she may object to the methods Leonard deployed to recover the missing files, it is well established that "sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims."  Baloch, 550 F.3d at 1199.  After all, "not everything that makes an employee unhappy is an actionable adverse action." Bridgeforth v. Jewell, 721 F.3d 661, 663 (D.C. Cir. 2013); see also Burlington N., 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms.").  As relevant here, Plaintiff "does not demonstrate any tangible harm associated with" Leonard's comments, nor does she "explain how such an incident would have 'dissuade[d] a reasonable worker from making or supporting a charge of discrimination.'"  Alford, 908 F. Supp. 2d at 171 (quoting Burlington N., 548 U.S. at 57).  Likewise, she has not produced evidence showing that Leonard's comments "could affect [her] position, grade level, salary, or promotion opportunities."  Baloch, 550 F.3d at 1199.  As a result, the Court cannot find that this episode amounts to an adverse action for purposes of Plaintiff's retaliation claim.

### iii.    Attempted Transfer

Chatman further contends that she suffered retaliation when her supervisors allegedly attempted to transfer her out of CSD to another USDA division.  See Pl. Opp. at 22–24 (citing various attempted transfers).  According to Plaintiff, these efforts occurred because she supported two colleagues' EEO complaints and filed her own in April 2013.  Id. at 23.  The parties address the various attempted reassignments only briefly, and neither sheds much light on

the facts surrounding them.  According to the agency, at least one potential transfer in mid-2013 — to a civil-rights division within the Farm Service Agency (another component of USDA) — would have provided the very remedy Plaintiff had requested in an EEO complaint — namely, obtaining supervisors other than Moore and Leonard.  See MSJ at 15; 5/8/14 EEO Investigative Report at ECF p. 177; see also id. at p. 78 (Plaintiff requesting "[t]ransfer out from under Ms. Moore's supervision and OASCR").  It was only when Chatman herself expressed opposition to such transfer that it did not proceed.  See 5/8/14 EEO Investigative Report at ECF pp. 195, 200; see also Am. Compl. at 16 (Plaintiff stating that she "expressed she was not interested" in FSA transfer "and as a result she was not reassigned").

The Court need not belabor the details (or bemoan the lack thereof), however, for as Plaintiff admits, she was never reassigned at all.  See Am. Compl. at 16; 3/15/16 Chatman Depo. at ECF p. 154.  Although an actual transfer may (but need not) constitute a materially adverse action, the mere fact that her supervisors considered or took preliminary steps toward potentially reassigning her does not suffice.  See Peterson v. Utah Dep't of Corr., 301 F.3d 1182, 1190 (10th Cir. 2002) (holding that unsuccessful attempt to transfer employee was not materially adverse action to support retaliation claim); Albert v. Perdue, No. 17-1572, 2019 WL 4575526, at *9 (D.D.C. Sept. 20, 2019) (finding that potential transfer that "never materialized" was not adverse action); cf. Arnold v. Jewell, 6 F. Supp. 3d 101, 111–12 (D.D.C. 2013) (similar, but for disparate-treatment claim).  Nor does Plaintiff endeavor to explain how management's alleged "attempt[s] at reassigning her," Pl. Opp. at 23, caused her "tangible harm" or "would have 'dissuade[d] a reasonable worker from making or supporting a charge of discrimination.'" Alford, 908 F. Supp. 2d at 171 (quoting Burlington N., 548 U.S. at 57).  Chatman, moreover, does not even attempt to establish that the potential reassignments would have resulted in either

"significantly diminished responsibilities" or a loss in seniority coupled with a resulting

reduction of tangible benefits, as required to establish an adverse action underlying this type of

retaliation claim.  See Sledge v. District of Columbia, 63 F. Supp. 3d 1, 21 (D.D.C. 2014)

(explaining that determination of whether or not reassignment is materially adverse action

depends on "compar[ing] the position the plaintiff held before the transfer to the one [she] holds

afterwards") (quoting Pardo–Kronemann v. Donovan, 601 F.3d 599, 607 (D.C. Cir. 2010)).

Once again, therefore, this component of Plaintiff's retaliation claim cannot withstand

Defendant's Motion.

### iv.    Other Incidents

In her Opposition, Plaintiff contends that following the May 2015 public release of an

OSC report based on her complaint alleging mismanagement and inefficiency within OASCR,

one of her supervisors told two staffers "that their names were mentioned in the . . . report and

encouraged them to file EEO complaints against [Plaintiff]."  Pl. Opp. at 34; see also id. at 41.

Chatman, however, declines to provide any evidentiary support or record citation in support of

this naked allegation, and she does not point to any complaints that were ultimately filed.  The

Court cannot credit such unsupported assertions at summary judgment.

Next, her Opposition accuses Defendant of "retaliating against her by not processing her

[EEO] Complaint in a timely manner."  Id. at 40.  But the EEO complaint at issue, Plaintiff

makes clear, was filed on April 4, 2020.  Id.  Regardless of the merit of this charge, she cannot

assert it here, as it necessarily was not encompassed within her Amended Complaint filed nearly

two years earlier on July 2, 2018.  See Am. Compl. at 1.  Plaintiff has not supplemented that

pleading, and she cannot broaden or amend it in her Opposition.  Jo, 582 F. Supp. 2d at 64.

Although her Amended Complaint contends that "she was discriminated against" when an

OASCR supervisor "deliberately delayed the processing of her [May 22, 2013, EEO] complaint by more than 200 days," Am. Compl. at 25, her Opposition never mentions this assertion, much less attempts to support it.

The Opposition also appears to argue that Leila Levi, agency counsel on Plaintiff's 2019 MSPB appeal, violated her "privacy rights" by allegedly continuing to work on the appeal after Levi's temporary appointment had expired.  See Pl. Opp. at 39–40.  Thankfully, the Court need not attempt to decipher precisely how Chatman believes such conduct constituted "ongoing retaliation," id. at 39 (capitalization altered), for it postdates the Amended Complaint by more than a year.  As above, the Court cannot now consider this new instance of alleged retaliation.

Finally, Plaintiff briefly contends that she "could have competed" for a higher-paying, GS-14 position that became available in 2016 had she been made a permanent employee in 2015. Id. at 42.  She attributes the denial of that opportunity to retaliation.  Id.  But this contention simply recycles her failed non-selection claim in slightly different packaging.  The result remains the same.

The Court, accordingly, will enter judgment for USDA on Chatman's discrete discrimination and retaliation claims.

C. Hostile Work Environment

With the finish line finally in sight, the Court looks at Plaintiff's contention that the agency violated Title VII (and perhaps the ADEA) by creating a hostile work environment.  See Am. Compl. at 35–37.  In support, she broadly asserts that she experienced constant "harassment," pointing to an array of incidents throughout her stint at USDA.  See Pl. Opp. at 17–29.  As will soon become clear, none of these occurrences, taken either individually or collectively, establishes a triable issue of fact on her hostile-environment claim.

An office becomes "hostile" for the purposes of Title VII only if the allegedly offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."  Harris v. Forklift Sys. Inc., 510 U.S. 17, 21–22 (1993) (citation and internal quotation marks omitted).  In evaluating such a claim, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  Baloch, 550 F.3d at 1201.  By adhering to these standards, the Court thereby "ensure[s] that Title VII does not become a 'general civility code'" that involves courts in policing "the ordinary tribulations of the workplace."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); then quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)).

At times, Plaintiff's Opposition reads more like a laundry list of grievances and perceived slights suffered at the hands of her various supervisors than an attempt to set out a coherent hostile-environment claim.  The Court, nonetheless, has waded through her brief — and the record, as the majority of her assertions lack accompanying citations — and sets out the following alleged incidents on which she seems to primarily base her claim:

- In February 2013, Leonard accused a group of CSD employees including Plaintiff of hiding EEO complaint files and offered amnesty if the files were returned, statements which Moore generally reiterated.  See Jackson EEO Affidavit at ECF p. 3; 5/8/14 EEO Investigative Report at ECF pp. 20, 22; Pl. Opp. at 17, 28;

- In February 2013, Moore told another employee that Plaintiff was "obviously limited"; angrily informed Plaintiff that she was not to assist in training a co-worker; and told Plaintiff something to the effect of, "[Y]ou don't belong here," in apparent reference to OASCR.  See 5/7/13 EEO Complaint at ECF p. 32; 11/6/19 Chatman Depo. at 36–37, 41, 43–44; Pl. Opp. at 17;

- In March 2013, Moore required Plaintiff to attend a three-day "Legal Sufficiency Review Training," which covered various procedures relating to EEO complaint processing.  See 5/8/14 EEO Investigative Report at ECF pp. 72–73, 173–74;

- In September 2014, Winona Scott, one of Plaintiff's former supervisors, issued a sworn OSC statement that she "suspect[ed] that" individuals including Plaintiff "may have intentionally delayed the processing of EEO . . . complaints."  In his own statement, Leonard stated that he "suspect[ed] that" Plaintiff and another individual "may have intentionally hid complaint files."  Pl. Opp., Exh. 23 (Leonard OIG Statement) at 4; id., Exh. 24 (Scott OIG Statement) at ECF p. 6;

- Glover sent private text messages to a co-worker regarding Plaintiff, which included the following: "She's been an artful [sic] employee from what I hear"; "No one wants anything to do with her"; "She just wants to complain"; and "[S]he's a complaining Smurf who doesn't like to work."  MSJ, Exh. 15 (Documents) at ECF p. 49 (2/10/16 EEO Complaint); Pl. Opp., Exh. 17 (Glover Text Messages) at ECF pp. 1–2;

- Glover used profanity in the office and was "moody and highly critical," and Moore made condescending comments toward Plaintiff "[o]n more than one occasion."  Pl. Opp. at 21, 25, 29; and

- Plaintiff had to put together her own work station because CSD was short on supplies. Id. at 21–22.

These incidents, however, are largely "isolated, typical workplace occurrences."  Moss, 2020 WL 4001467, at *11.  Even viewing the evidence in the light most favorable to Plaintiff, it is a far cry from satisfying the "demanding standard[] for a hostile work environment claim" under federal law.  Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (citation and internal quotation marks omitted).

First, the various episodes Chatman documents do not rise to the level of "severe or pervasive" abuse.  "Although many employees may wish it were otherwise, Title VII sets a high bar for the types of behavior that create a hostile workplace."  Jenkins, 281 F. Supp. 3d at 87. For instance, disagreements between a plaintiff and her supervisors are generally to be expected in a workplace.  See Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud

27

expressions of disapproval) are the kinds of normal strains that can occur in any office

setting . . . ."); Holmes-Martin v. Sebelius, 693 F. Supp. 2d 141, 165 (D.D.C. 2010) (rejecting

hostile-work-environment claim when plaintiff provided insufficient evidence that public

criticism of job performance, supervisor's imposition of unreasonable deadlines and

requirements, and exclusion from meetings "rose beyond the level of ordinary workplace

conflicts").  "[C]ourts typically do not find . . . 'work-related actions by supervisors' to be

sufficient for a hostile work environment claim."  Munro v. LaHood, 839 F. Supp. 2d 354, 366

(D.D.C. 2012) (citation omitted).  In addition, the few isolated comments from supervisors about

which Plaintiff complains — none of which was "accompanied by physical threats, abusive or

offensive language[,] or any other characteristics of 'extreme conduct,'" Lewis v. District of

Columbia, 653 F. Supp. 2d 64, 82 (D.D.C. 2009) (citation omitted) — do not exhibit the

requisite severity and offensiveness.  While some of the detailed incidents "may well have been

unpleasant," they "simply do not reveal a pattern of behavior that is either sufficiently severe or

pervasive" to alter the conditions of her employment and create an abusive working

environment.  Aldrich v. Burwell, 197 F. Supp. 3d 124, 137 (D.D.C. 2016).

        Even more fundamentally, Plaintiff "seems to ignore the requirement that, in order to

violate Title VII, the 'intimidation, ridicule, [or] insult' must be discriminatory" or retaliatory —

that is, because of her race, sex, age, or protected activity.  Jenkins, 281 F. Supp. 3d at 88

(emphasis omitted) (quoting Peters v. District of Columbia, 873 F. Supp. 2d 158, 188–89

(D.D.C. 2012)); see also Hutchinson v. Holder, 815 F. Supp. 2d 303, 323 (D.D.C. 2011).

"[H]ostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile

work environment unless there exists some linkage between the hostile behavior and the

plaintiff's membership in a protected class."  Na'im v. Clinton, 626 F. Supp. 2d 63, 73 (D.D.C.

2009); see also Baloch, 550 F.3d at 1201 (upholding summary judgment on hostile-environment claim when "none of the comments or actions directed at [plaintiff] expressly focused on his race, religion, age, or disability"); Chaple v. Johnson, 453 F. Supp. 2d 63, 73–74 (D.D.C. 2006) ("It must be clear that the hostile work environment was the result of discrimination based on a protected status.") (citation omitted).  "There is an evidentiary component to this principle: evidence that bears no connection to the plaintiff's protected status cannot support a hostile work environment claim."  Mason v. Geithner, 811 F. Supp. 2d 128, 179 (D.D.C. 2011).

Here, Chatman makes essentially no attempt to establish that the aforementioned episodes were related to her race, sex, age, or protected activity, let alone present evidence to that effect.  Indeed, the individuals about whom Plaintiff generally complains largely share her protected characteristics: Moore, Scott, and Glover are all Black women (with the former two over 40), and Leonard is a Black man over 40.  See Pl. Opp. at 3–4, 6.  The only comment or action that even arguably relates to any of her protected characteristics is Glover's calling her a "Smurf" — a term Plaintiff contends carries racist connotations, id. at 25–26 — in a private message to a co-worker.  But Chatman only learned of such comment after she left the agency, see MSJ, Exh. E (2/14/18 Chatman Depo.) at 35, and "[c]onduct that [she] did not know about . . . cannot be used to establish that she was subjected to a hostile work environment."  Hutchinson, 815 F. Supp. 2d at 321.  In any event, this "[i]solated incident[]," even if interpreted as she believes, does "not create harassment severe or pervasive enough to constitute an actionable hostile work environment."  Hyson v. Architect of Capitol, 802 F. Supp. 2d 84, 104–05 (D.D.C. 2011); see also Na'im, 626 F. Supp. 2d at 74 (explaining that although plaintiff had described several statements touching on race, she "has offered no evidence indicating that these statements were frequent, widely disseminated or otherwise pervasive").  Because Plaintiff

cannot show a "correlation to the claimed ground[s] of discrimination" or protected activity, she thus presents no issue of triable fact on this count.  Jenkins, 281 F. Supp. 3d at 88 (alteration in original) (quoting Bryant v. Brownlee, 265 F. Supp. 2d 52, 63 (D.D.C. 2003)).

Finally, Chatman tacks on a claim that she confusingly styles as "sexual harassment of a third party."  Pl. Opp. at 2, 34 (capitalization altered).  In reality, her contention seems to be that an alleged "relationship" between Glover and Leonard somehow amounted to sexual harassment that in turn created a hostile work environment.  Id. at 35–37.  In support, she highlights a 2013 "drinks and cigars" outing between the two individuals; a "joke" Glover played on Leonard by pretending to resign on his birthday; and the fact that Glover occasionally accompanied Leonard on business travel.  Id. at 34–35; Chatman EEO Affidavit at ECF pp. 55–56, 188–89.  It is unclear how any of these incidents amount to harassment, as Plaintiff points to no inappropriate workplace comments, lewd behavior, or even direct evidence of the romantic or sexual relationship that she implies may have existed — and that both Glover and Leonard deny.  See 6/11/16 EEO Investigative Report at ECF p. 1; Glover EEO Affidavit at ECF p. 23.

In any event, and more urgently, Chatman never demonstrates how the complained-of conduct affected her, as she does not suggest that she experienced any harassment personally. Instead, she seems to argue that Leonard's undefined relationship with Glover, and the alleged "preferential treatment" he afforded her, "caused for a hostile work environment because Candace Glover was now wielding power."  Pl. Opp. at 34–35.  But the Court has already explained why Plaintiff's Glover-related evidence does not nearly rise to the level of severe or pervasive abuse.  To the extent she contends, more broadly, that OASCR maintained a "sexually charged" atmosphere, id. at 20, such conclusory assertions devoid of specific evidentiary support will not do at summary judgment.  See Aldrich, 197 F. Supp. 3d at 137–38 (determining that

"allegedly 'rude, hostile, and otherwise demeaning treatment' . . . is too vague and conclusory to meaningfully contribute to" plaintiff's hostile-environment claim); <u>Brady v. Livingood</u>, 456 F. Supp. 2d 1, 10–11 (D.D.C. 2006) (rejecting claim where plaintiff described hostile work environment in "broad, generalized terms"), <u>aff'd sub nom.</u> <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490 (D.C. Cir. 2008).

Put simply, the actions and incidents to which Plaintiff points do not approach the high bar for a hostile work environment. Judgment will thus be entered on this claim as well.

## IV.    Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting Defendant's Motion on all counts.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>October 15, 2020</u>